

**IT IS ORDERED as set forth below:**

**Date: September 8, 2023**

_____
**James R. Sacca**
**U.S. Bankruptcy Court Judge**

_____

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | | |
|---|---|---|
| IN RE | : | |
| | : | Chapter 11 |
| | : | |
| ALACRITY HOLDINGS 6, LLC, | : | Case No. 22-20284-JRS |
| Debtor. | : | |
| | : | |
| | : | |
| ALACRITY HOLDINGS 6, LLC, | : | Removed Case: |
| | : | |
| Plaintiff, | : | SUPERIOR COURT OF |
| | : | BIBB COUNTY, STATE |
| Vs. | : | OF GEORGIA, |
| | : | CASE NO. 2021-CV-074647 |
| MADAN POPLI, | : | |
| | : | Adversary Proceeding No. |
| Defendant. | : | 22-02020-JRS |
| | : | |
| | : | |

## <u>ORDER</u>

This case requires examination of what constitutes sufficient consideration

and proper corporate authority to enforce a contract.  For example, under what

1

circumstances, if any, can an individual member of a multimember LLC pledge all of the LLC's assets to secure an alleged debt owed only by the individual member without the consent of the other members?  Is the grant of such a pledge enforceable against the LLC if it received no benefit from the loan to or obligation of the individual member?  Was there any consideration for the note and security deed signed by the individual member?  Are there any limitations on whether the settlement of a lawsuit can constitute adequate consideration for a such a pledge?   Can a subsequent purchaser of the property challenge the validity of the lien on its property if it was not a party to the security document?   Other issues include whether the Defendant – a holdover tenant – is liable for damages to the property that the Debtor discovered upon gaining possession of the property from him after it purchased the property and had him evicted, and whether the Defendant owes fair market rent while he unsuccessfully appealed the eviction or whether he only owes the monthly amount stated in the agreement with the prior owner, which amount the Superior Court judge ordered be paid into the registry of the Court pending the outcome of the appeal.

## **BACKGROUND**

The dispute in this case centers around a gas station located at 4331 Pio Nono Avenue in Macon, Georgia (the "Property").   Madan Popli ("Popli") owned the Property in 2014, but in 2016 Popli got caught in an illegal gambling operation related to coin operated amusement machines issued by the Georgia Lottery, which led to civil RICO charges being brought by the Houston County, Georgia District Attorney,

the assessment of a large fine and Popli's eventual arrest.[1]  As part of the consequence of this gambling operation, the Houston County District Attorney seized Popli's assets and passport, restricted his travel rights out of the country, and Popli was forbidden from owning or operating a gas station in his name or being licensed for coin operated amusement machines in the future.

The Property was among the assets seized by the Houston County District Attorney, who sold it at a foreclosure sale in 2016 in partial payment of the fine owed. At the foreclosure sale, Madan Lal ("Lal"), a cousin of Popli, bought the property through Robin Globe, LLC ("Robin Globe") for $1,150,000.  Lal owned and operated Robin Globe solely in his name, but Popli testified that he maintained a verbal interest in Robin Globe, and in turn the Property, and that he did not need this interest reflected in paperwork because he trusted Lal, his cousin.  Notably, no other evidence showed that Popli had a membership interest in Robin Globe, and as mentioned above the store licenses could not be in Popli's name due to the illegal gambling operation he ran in the past.[2]  Lal did not testify at trial.

On February 20, 2019, the Property was sold again, this time to Durga Investments, LLC ("Durga").  Lal had reached out to Rajesh Kumar ("Kumar") with a plan to form Durga in order to purchase the Property and to use the proceeds of the sale to pay debts owed to the state stemming from the illegal gambling scheme,

---

[1] The evidence was unclear on the point of whether or to what extent Popli was ever criminally charged or convicted of any crimes in connection with his part in the illegal gambling operation.
[2] The Court doubts that the Houston County District Attorney would have sold the Property to Robin Globe had he been aware of Popli's alleged interest in Robin Globe given that the District Attorney had just seized the Property from Popli and restricted his ownership of such properties.

including Popli's.   Kumar, who knew Popli and Lal from running gas stations in Milwaukee, did in fact form Durga with Lal, and Durga purchased the Property.   At the outset, Lal and Kumar operated Durga as 50/50 partners with no formal operating agreement.

At some unspecified point in 2019, Popli alleges that he loaned Kumar $500,000.   Again, no documentary evidence showed that Popli ever loaned Kumar anything or that Kumar had any obligation to Popli, other than a promissory note executed by Kumar more than a year later.   No receipts for this alleged loan exist, and no bank statements, checks, or communications evidencing the loan or other obligation were produced at trial.   Nevertheless, Popli testified that at some time in 2019 he gave Kumar $500,000 in cash.   On cross examination Popli testified:

> Q: So you just walked into the gas station with $500,000 in cash in a suit case and handed it to Rajesh Kumar?
>
> A: Yes.

When asked where the money came from, Popli said that he got somewhere between $125,000 and $160,000 from Shaneel Lalani ("Lalani"), and that the rest of the cash, an amount in excess of $300,000, came from funds he had sitting around in his home. When asked why and how he had this much cash on hand in his home, Popli testified that he made the money from cash sales and game machines while operating gas

4

stations in the past.  Kumar denied ever receiving a loan from Popli.[3]  Lalani also testified that he never gave or loaned Popli any amount of money, let alone $150,000 or so.  Once again, no documents were produced to support any transfer of money from Lalani to Popli.

Popli testified that after he gave Kumar the $500,000 in cash, Kumar paid that $500,000 by check to the state of Georgia on Popli's behalf to settle a fine related to the illegal gambling scheme that Popli got caught running.  No check or other document was presented to the Court as evidence to support this statement.  While Kumar denies ever receiving any cash from Popli, Kumar did testify that Lal used proceeds from the sale of the Property from Robin Globe to Durga to pay off the state and free up Popli's and other people's passports that were seized or restricted as a consequence of the illegal gambling operation.  But no documents were admitted into evidence to support that testimony, either, and as previously mentioned, neither party called Lal as a witness.

Immediately following the sale of the Property to Durga, Lal operated the store, but in December of 2019, Kumar moved from Milwaukee to Macon and began running the store.  With Lal's consent, Kumar formed Anika Gas N Go, Inc., ("Anika") to run the store.  Kumar got licenses in Anika's name, including licenses for coin

---

[3] Kumar testified that the $500,000 Popli is allegedly owed related to issues Popli had with Pawan Kumar, who is another of Popli's cousins, and a separate property in Milwaukee completely unrelated to the Property, but no documents were introduced to substantiate that claim.  Despite the name, Pawan Kumar has no relation to Rajesh Kumar.

operated amusement machines, and put the coin operated amusement machines back into the store in order to drive up value for the store in hopes of selling the Property.

Shortly thereafter, Popli began showing up to the Property and telling Kumar that he owned the store. On December 19, 2019, with the help of attorney Joshua Hale ("Hale"), Popli filed a mechanic's lien on the Property in the amount of $500,000, even though Popli himself testified that he never provided any labor, material, or services to support the claim of lien. Around this same time, Popli had been engaged in discussions to purchase the Property through an intermediary named Snehalbai "Kenny" Patel ("Kenny"). Popli testified that his plan was to give Kenny money and have Kenny purchase the store in his name on Popli's behalf because Popli could not get a loan. Kenny and Durga entered into a purchase and sale agreement on May 7, 2020, and Kenny paid a deposit of $100,000 to Durga to purchase the Property. The Property ultimately did not sell to Kenny because Kenny "backed off."

On December 4, 2020, Popli commenced a lawsuit on the mechanic's lien. Kumar received notice of the commencement of the lawsuit on the claim of lien after he moved back to Milwaukee and had to return to Macon to deal with the situation. After some discussion, Kumar got into Popli's car and Popli drove Kumar to Hale's office on January 29, 2021. Hale prepared some documents and Kumar was told that if he signed the documents the lawsuit on the claim of lien would go away. These documents turned out to be a Promissory Note from Kumar in his individual capacity to Popli for $500,000 (the "Note"), and a Deed to Secure Debt from Durga in favor of Popli pledging the Property as collateral for the Note (the "Security Deed"). There

6

was no evidence that Durga received any benefit from any obligation that Kumar may have had to Popli.  In fact, the evidence showed that even if Popli advanced money to Kumar, only Popli benefited from it because Popli testified that Kumar used the money to pay an obligation for Popli's benefit.

The Court heard conflicting testimony on the point of whether Kumar knew what he was signing.  Kumar testified that he did not know what he was signing, and that the entire interaction in Hale's office only lasted a matter of minutes.  He testified that he signed the documents because he wanted to make the lawsuit on the claim of lien go away and was told that these documents would make that happen. Popli testified that Kumar took the time to read the documents thoroughly and that Hale actually spent time explaining the documents to Kumar.  However, Popli also testified that it was Kumar's idea to go to Hale's office and have Hale prepare the Note and Security Deed even though Hale was Popli's attorney, not Kumar's.  Hale did not testify at trial, either.

No evidence was presented to the Court indicating that other members of Durga consented to encumbering the Property with the Security Deed.  Further, Kumar testified that at the time he only held 50% of the membership interests of Durga, and that Lal, the only other member of Durga, did not consent to Durga granting a Security Deed covering the Property.[4]

---

[4] The Note does state in the middle of the second paragraph that the "Borrower" – which was Kumar – is the "majority member" of Durga, but no document signed by Lal affirming that as fact was ever produced to support that, either.

The Security Deed also does not list settlement of the lawsuit on the claim of lien as consideration.[5]  Instead the Security Deed states:

> "That Grantor [Durga], in consideration of the sum of FIVE HUNDRED THOUSAND AND 00/100S DOLLARS ($500,000), in hand paid by Grantee [Popli], receipt of which is hereby acknowledged, does hereby grant, bargain, sell, assign, and convey to Grantee: …"

*See* Security Deed, p. 1.

Although Durga was the Grantor of the Security Deed, and the Security Deed recites that the "Grantor" acknowledged receipt of $500,000 "in hand paid," the evidence was clear that Durga did not receive anything, let alone $500,000, from Popli on or before the date the Security Deed was signed.

Popli's efforts to reclaim the Property did not stop at the Security Deed.  On April 15, 2021, Kumar, acting on behalf of Anika and allegedly with the consent of Lal, drafted a handwritten document with terms, among other things, purporting to sell half of store's the inventory to Popli and allowing him to run the store (the "Handwritten Agreement").  Both Kumar and Popli signed this Handwritten Agreement, and the terms stated that Popli would pay $50,000 now, plus pay rent at $5,000 a month, and further allowed Popli to use licenses in Kumar's and Anika's name to run the store "until he close the deal."[6]  Popli was also responsible for paying

---

[5] The lawsuit on the claim of lien was not dismissed until May 13, 2021.  The lien has expired due to a failure to file a renewal action, but it has not been cancelled.  Popli admits that the claim of lien should be cancelled.

[6] The Handwritten Agreement references that a $40,000 check was written by Popli as part of this transaction.  It seems strange that he would write a check for this transaction but allegedly give Kumar $500,000 in cash as a loan without the need to use checks or a bank account or the need to document that alleged loan in any way.  The Court also finds it strange that Popli would pay Kumar or Anika any amount of money at all given that Kumar allegedly owed Popli $500,000.

taxes, lottery, and all other bills.  Testimony indicated that "until he close the deal" referred to Popli purchasing the Property from Durga – either through Kenny or someone else – and putting the Property, store, and licenses in his own name.  This handwritten document was drafted and signed in the office on the Property with Sourav Gaba ("Gaba") also present.  Kumar testified that he sold Popli the inventory despite the issues he had encountered with Popli in the past because he wanted to be finished running the store, wanted to leave Macon for good, and wanted to stay in Milwaukee with his family.

Popli then attempted to further sublease the store on the Property to Gaba. On April 15, 2021, Gaba formed Food 4331 Pio Nono, Inc., ("Food 4331"), and Gaba and Popli entered into a verbal agreement that allowed Gaba, through Food 4331, to run the store for $5,000 monthly rent.  Gaba opened bank accounts to run the store and put the utilities under Food 4331.  Gaba testified that he understood this $5,000 rent to be an accommodation Popli had given him since the two had been long time friends and knew each other dating back to when Gaba was a child and the two spent time together in India.  But he also testified that he had heard of other people renting gas stations for $3,000 to $5,000 a month, and that this $5,000 rent could have been fair market value.

While Kumar had been waiting on the potential sale to Kenny to close, he also had been negotiating a sale of the Property to Alacrity Holdings 6, LLC ("Alacrity"). Lalani owned Alacrity as a holding company for real estate investments, and at this point in time he had hired Stephen Klein ("Klein") to serve as the manager of Alacrity,

but Klein reported to Lalani.  When Popli discovered that Alacrity had entered the mix as another potential buyer, Popli began contacting Lalani and encouraging Lalani to purchase the Property from Popli for a better price.  Lalani eventually realized that Popli was "playing games" because Popli had an interest in no one purchasing the Property so he and his subtenant could continue operating the store with low rent payments.  Lalani ceased contact with Popli about buying the store, and Alacrity then purchased the Property from the rightful owner, Durga, for $1,350,000 on May 6, 2021.  Alacrity, unaware that Anika sold half of the store's inventory to Popli in April, also purchased the inventory in the store from Anika on May 6, 2021.

The Sale Documents from Durga to Alacrity (the "Sale Documents") contain an Amended, Restated and Replacement Operating Agreement for Durga dated May 4, 2021 (the "Operating Agreement"), which lists Kumar as holding 55% of the membership interests with the remaining interests split between Lal with 16% and Pawan Kumar ("Pawan") with 29%.[7]  The Operating Agreement was signed by all of the members of Durga and further stated that the members elected "Rajesh Kumar to serve as the initial Manager of the Company."  The Sale Documents also contain a Unanimous Written Consent Action of the Members of Durga authorizing the sale of the Property to Alacrity, which was also signed by each of the members of Durga. Oddly, following the sale of the Property to Alacrity, Lal and Pawan tried to sell their

---

[7] This is the same Pawan Kumar mentioned in footnote 3 who is a cousin of Popli.

membership interests in Durga to Popli, but the prior sale of the Property to Alacrity nullified this agreement.

Kumar did not disclose the Security Deed to Lalani or anyone at Alacrity because Kumar was allegedly unaware that the Security Deed existed. Still, Lalani learned of Popli's Security Deed prior to closing on the Property during due diligence. The Sale Documents therefore included an Escrow Agreement to deal with certain disputed interests in the Property (the "Escrow Agreement"), specifically putting into escrow $500,000 for the potential claim of Popli and $100,000 for the claim of Kenny related to his deposit. There was another $250,000 also placed into escrow for additional amounts possibly needed to potentially pay Popli and Kenny, who were defined as the "disputed payoff parties." Kumar testified that he subsequently paid Kenny $150,000, part of which covered the return of his deposit. The Escrow Agreement did not permit the Escrow Agent to pay Popli without the consent of both Durga and Alacrity.

After Alacrity purchased the Property, Lalani discussed with Popli a payoff of the Security Deed, but such attempts failed due to what Lalani perceived as Popli being "unrealistic." Popli demanded a 10-year lease allowing him to continue to run the store on the Property in addition to payment of the $500,000 listed in the Security Deed. Only if both of these conditions were met would Popli agree to cancel the Security Deed. Lalani testified that this "unrealistic" behavior caused attempts at paying off Popli's Security Deed to fail.

11

The Security Deed was not the only problem Alacrity faced as the new owner of the Property. Despite Alacrity's attempts to gain possession, Popli and his subtenant refused to vacate the Property. In fact, on June 1, 2021, notwithstanding the recent sale of the Property to Alacrity, Popli and Gaba both signed a written lease agreement allowing Gaba, again through Food 4331, to run the store for $5,000 monthly rent, payable to Popli.[8] Interestingly, Popli signed the lease as the manager of Durga, even though he did not act as the manager of Durga at this time or any other time, and even though Durga had just sold the Property to Alacrity.[9]

The refusal to vacate the Property led Alacrity to file a dispossessory action in the State Court of Bibb County to have Popli and Food 4331 removed (the "Eviction Action").[10] Alacrity succeeded in this action, and Popli and his subtenant Food 4331 were ordered to leave the Property on August 3, 2021. Instead of leaving, Popli appealed the order. During the pendency of the appeal, Popli and his subtenant were ordered to pay $5,000 a month – the amount stated in the handwritten agreement between Popli and Anika – into the registry of the State Court to be held for Alacrity, which payments Gaba made.

While the appeal remained pending and Popli and his subtenant remained in the Property, Alacrity filed a lawsuit against Popli in the Superior Court of Bibb

---

[8] The lease documents show rent at $1,000 a month, but Gaba testified that he paid Popli $5,000 a month, which is the same rent as the verbal agreement Gaba and Popli had prior. Gaba testified that he and Popli decided to document the lease terms instead of relying on the past verbal agreement because they needed a written lease to get some licenses in Food 4331's name.

[9] Throughout his testimony Popli also claimed that he maintained a verbal membership interest in Durga off the record. No documents show Popli ever having any interest in Durga.

[10] Case No. 21-SCCV-092933, filed on June 3, 2021.

County seeking to quiet title to the Property and arguing that Popli's Security Deed was invalid due to a lack of consideration ("Quiet Title Action").[11]  Before the validity of the Security Deed could be determined in the Quiet Title Action, the Note and Security Deed came due on January 28, 2022, and Popli began non-judicial foreclosure proceedings for a foreclosure sale to take place in April of 2022.  Alacrity sought a temporary restraining order preventing Popli from foreclosing until the Quiet Title Action was resolved, but the Superior Court denied the motion.  Thereafter, Alacrity filed bankruptcy on April 5, 2022, to halt the foreclosure of its Property under what it believed to be an unenforceable Security Deed.[12]

After the filing of the bankruptcy, Popli still refused to vacate the property as his appeal remained pending.  On May 27, 2022, the Georgia Court of Appeals affirmed the order of the State Court evicting Popli and his subtenant from the Property.  Alacrity then removed the Eviction Action to this Court on June 3, 2022, and filed an Emergency Motion for Writ of Possession on June 30, 2022.[13]  Following a hearing on July 7, 2022, this Court granted the writ and required Popli and his subtenant to vacate by July 22, 2022, which gave Popli and his subtenant time to leave the Property.[14]

---

[11] Case No. 2021-CV-07647, filed on June 28, 2021.
[12] The Quiet Title Action was removed to this Court on June 3, 2022, and makes up the current matter under case no. 22-2020-jrs.
[13] *See* [Doc. 4; case no. 22-2021-jrs].
[14] *See* [Doc. 10; case no. 22-2021-jrs].  The Court provided Popli and his subtenant two weeks to vacate so there could be an orderly transition of the Property to Alacrity and a reconciliation of the inventory, neither of which happened.

The Court heard conflicting testimony regarding when the keys were turned over to Alacrity.  Gaba testified that he vacated the Property on July 22, 2022, locked the doors, and then awaited instructions regarding who to turn the keys over to.  Lalani testified that Popli and Gaba had in fact still not vacated the Property by July 25, 2022, which led Lalani to continue efforts to coordinate the turning over of the keys.  Gaba testified that he received a call from Deepesh Patel ("Deepesh") on the evening of July 26, 2022, at which time he was instructed to meet Deepesh the next day to hand over the keys.  According to Gaba, he did hand the keys to Deepesh, who was acting on behalf of Alacrity, on July 27, 2022.

Lalani testified that Deepesh was a prospective tenant of Alacrity's, who picked up the keys on Alacrity's behalf on July 29, 2022, got into the store that day, and sent Lalani pictures of the store.  Deepesh did not lease the store at that time,[15] and based on the report from Deepesh, Lalani decided he had to go down and see the store for himself.  When he got there, Lalani found the store completely destroyed.  All of the inventory was gone, the point-of-sale machines were gone, the coolers were gone, wires were cut, the air conditioning unit was gone, and the surveillance camera was gone.  Lalani identified photos of the damage that matched what he saw that day.  He further testified that it would take about an entire day to cause that much damage and destruction.  He testified that he is familiar with security on convenience stores and that it usually takes 10-20 minutes for the police to arrive if the alarm system

---

[15] Deepesh did not testify at the trial.

was armed.  Notably, there was no sign of forced entry.  No windows were broken, and the door was not broken.

Despite all of this, Gaba testified that when he left the store, he left it in good order with the floors mopped and the inventory on the shelf.  The store had an alarm system, but Gaba testified that no one ever armed the system because the store remained open 24 hours a day.  Popli testified that he did not cause this damage to the store and that he was in India at the time.  He testified that his passport would show a stamp that he was in India, but his passport was not entered into evidence, nor were any flight details or anything else evidencing a trip to India.

Gaba testified that he left some checks of his own at the store and that they were also stolen.  An affidavit of forgery that Gaba provided to his bank was entered into evidence that shows that someone tried to cash Gaba's Food 4331 checks, but the checks were dated in September, two months after they were allegedly stolen from the store.[16]  Gaba also testified that when he went to the bank to deal with the stolen check issue, someone actually showed up to the bank and tried to cash one of his checks.  The bank allegedly called the police and attempted to stall by claiming that the machines were down, but the police were unable to get to the bank for 20-30 minutes, and Gaba left the bank for his own safety before the police arrived.  Despite this, Gaba said that he did not file a police report about the stolen checks or the person

---

[16] Gaba was also presented with other allegedly stolen checks dated in September and October, but he testified that he did not recognize these checks, that these checks did not list his company's name, and that these checks must have belonged to someone else who had left paperwork at the store.

who attempted to cash one of the stolen checks at the bank.  Instead, the bank allegedly handled everything for him and closed his account.

When asked why they left inventory at the store, Popli and Gaba testified that they had nowhere to put the inventory and could not sell it.  When asked why he left his checks, Gaba testified that he did not have time to collect them before vacating the Property; however, he was aware of this Court's Order requiring him and Popli to vacate the property 10-15 days before he actually left, which was plenty of time to vacate the Property with all of his belongings.  Gaba's testimony was certainly not credible in this regard.

Alacrity has been unable to find a tenant to lease the Property due to the damage.  Lalani estimates repairs to cost $150,000-$175,000, which includes replacement of the air conditioning units and significant electrical work to replace the wires that were cut and other repairs.  Written estimates indicated that replacing the point-of-sale machine would cost $29,218.60[17] and replacing coolers and air conditioning units would cost $50,700.  He also testified that utility bills went unpaid, leaving bills due for water and power.  Gaba testified that he paid all of the bills timely before vacating the property.

The Court also heard testimony from Klein, the former manager of Alacrity, who was qualified as an expert on rental values for convenience stores.  Klein prepared an expert report, which was admitted into evidence, that estimated the fair

---

[17] Lalani testified that the point-of-sale machine had been replaced by the time of trial at the cost reflected in the estimate but that it had not been installed yet.

market rental value of the store on the Property to be between $12,000 and $16,500 per month, well in excess of the $5,000 per month Anika agreed to sublease the store to Popli for until "he close the deal."

Alacrity filed an Amendment to the Verified Complaint on January 20, 2023, which, together with the Complaint, includes causes of action seeking the entry of an Order cancelling Popli's Claim of Lien and declaring it null and void; the entry of an Order cancelling the Security Deed and declaring it null and void; unpaid rent and additional rent due and owing from September 2021 through July 2022; and causes of action related to damages to the property, which are misappropriation and conversion, damage to real property under O.C.G.A. § 51-9-1, *et seq*, indemnification, punitive damages, and attorneys' fees.  Popli timely filed an Answer.  Following a trial on the issues where the Court received evidence and heard testimony and argument over three days, the Court asked the parties to submit post-trial briefing, which the parties both timely submitted.  The Court will now address the claims and issues herein.

## THE SECURITY DEED

Alacrity argues that the Security Deed is invalid for a few reasons.  First, Alacrity argues that Kumar did not have authority to execute the Security Deed because Kumar either did not hold a majority of the shares of Durga, or because no other members of Durga consented to Kumar signing the Security Deed that transferred the Property, which was Durga's sole asset or certainly substantially all of its assets.  Next, Alacrity argues that the Security Deed fails for a lack of

17

consideration.  Specifically, Alacrity argues that Popli never delivered $500,000 to Kumar, and even if he did give the money to Kumar, Popli himself admitted that Kumar turned around and paid that money to the state on Popli's behalf such that the alleged debt was immediately satisfied.  Alacrity also argues that the dismissal of the lawsuit on the claim of lien cannot constitute consideration for the Security Deed because the Security Deed does not list this as consideration and the lawsuit on the claim of lien was not a "bona fide dispute."  Lastly, Alacrity argues that Popli fraudulently induced Kumar into signing the Security Deed or that Kumar signed under duress.

Regarding the corporate authority issue, Popli argues that Kumar acted with apparent authority to execute the Security Deed on behalf of Durga.  As for consideration, Popli argues that the $500,000 debt Kumar allegedly owes him was an antecedent debt that served as consideration for the Security Deed.  Alternatively, he argues that settling the dispute regarding the lawsuit on the claim of lien can serve as consideration because Popli reasonably believed the lien was the proper route to memorialize the alleged debt Kumar owed him.  Popli next argues that Kumar, a businessman who had run gas stations in the past, knew what he was signing and that he was not under duress or fraudulently induced into signing the Security Deed. Popli also argues that the law of the case prevents this Court from inquiring into the validity of the Security Deed, and that parol evidence rules prevent this Court from looking beyond the four corners of the Security Deed in determining its validity.  He makes further arguments about the Security Deed being under seal and arguments

related to voluntary deeds.  Lastly, Popli takes issue with Alacrity challenging the Security Deed given that Alacrity was not a party to the Security Deed that was between Popli and Durga.

## A. **Alacrity May Challenge the Validity of a Security Deed on Its Property**

Popli asserts that Alacrity cannot challenge the Security Deed because Alacrity was not a party to the Security Deed.  Popli argues that "[g]enerally, it is [for] the maker of an agreement to plead lack or failure of consideration."  *See* [Doc. 37, footnote 3].  Popli continues "[h]ere, the maker, Kumar, has not filed any claim" but instead "Kumar is utilizing the Debtor's Bankruptcy Estate to further his defense that the Note and [Security Deed] fail for lack of consideration." *Id.*[18]

First, it is worth noting that Popli's argument is incorrect on the facts.  Durga, not Kumar, was the maker of the Security Deed.  While Kumar was the maker of the Note, Alacrity ultimately does not have to invalidate the Note to invalidate the Security Deed.  Alacrity's primary concern is the validity of the Security Deed covering its Property.  Second, Alacrity, as the owner of the Property, may challenge the validity of the Security Deed clouding the title to its property.

The Georgia Court of Appeals has held that one need not be a party to a deed to secure debt in order to challenge its validity.  *See Harris v. W. Cent. Georgia Bank*, 335 Ga. App. 114, 779 S.E.2d 441 (2015) (holding that a lender who sought to exercise its right to foreclose on a property under a deed to secure debt could challenge the

---

[18] Neither party sought to join Kumar or Durga as parties to this action.

validity of an alleged prior deed to secure debt covering the same property). In that case, Harris held a first priority security deed covering Adcock's property. *Id.* at 114. After the deed was cancelled of record, Adcock subsequently borrowed money against the same property and granted West Central Georgia Bank ("WCGB") a security deed. *Id.* at 114-115. When Adcock defaulted on the WCGB loan, WCGB sought to exercise its foreclosure rights. *Id.* Harris attempted to halt the foreclosure and have the cancellation of his security deed set aside as a forgery. *Id.* Following a trial, the trial court found that it was unnecessary to determine if the cancellation of Harris' security deed was a forgery because it agreed with WCGB that Harris' deed was "invalid for want of a debt actually secured by the instrument." *Id.* The trial court then dismissed Harris' complaint and granted WCGB's counterclaim to quiet title. *Id.*

On appeal, Harris argued that WCGB cannot bring a claim to quiet title because failure of consideration is a defense to an action in contract, and WCGB lacks "that connection or relationship" necessary to have the ability to attack an agreement between Harris and Adcock. *Id.* The Georgia Court of Appeals rejected this argument with the following:

> Although Harris asserts that WCGB could not bring an action to quiet title because it could not attack an agreement between him and Adcock, WCGB's counterclaim asserted that the invalid deed casts a cloud over its title to the property pursuant to a security deed granted by Adcock. *See* OCGA § 23–3–40 (proceeding to quiet title is sustained where any instrument casts a cloud over complainant's title).

*Id.* at 117.  Therefore, just as WCGB could challenge the validity of the security deed in *Harris*, Alacrity may challenge the validity of the Security Deed that it asserts casts a cloud over its title to the Property.

Moreover, as Alacrity points out, guarantors may challenge the validity of the underlying debt they guaranteed, and failure of consideration "is not a defense that is personal to the principal." *Jones v. Dixie O'Brien Div., O'Brien Corp.*, 174 Ga. App. 67, 68, 329 S.E.2d 256, 257 (1985) ("Generally, a guarantor may assert all defenses to a contract which would be available to his principal, with the exception of personal defenses, such as infancy, bankruptcy and incapacity.").  Further, a "guarantor is not liable to the creditor if there has been a total failure of consideration as to the underlying obligation...."  *Id.* (citing 38 AM.JUR.2d, Guaranty, § 51, p. 1054).  The same logic applies when a party's property secures another's debt by way of a deed to secure debt.

It is also worth noting that Alacrity could not simply pay off the Security Deed from the funds held in escrow to remove this cloud on its title.  First, the Escrow Agreement did not permit the funds in escrow to be disbursed to Popli without the consent of Durga, and Kumar, the manager of Durga, was opposed to that.  Second, recall that Alacrity did have discussions with Popli following its purchase of the Property, but those discussions failed because Popli demanded, in addition to the $500,000 that he was allegedly owed, a long-term lease allowing him to rent the Property.  It was this "unrealistic" behavior and Kumar's objections that caused discussions on a payoff to Popli to fail.  This stands in contrast to the successful

resolution of the other "disputed payoff party" issue with Kenny Patel.   Thus,
Alacrity's only real path forward to remove the cloud on its title was to challenge the
Security Deed it alleged was invalid for a number of different reasons.

## B. The Law of the Case Doctrine

Popli also argues that the law of the case prevents this Court from inquiring
into the validity of the Security Deed.   As previously noted, Alacrity sought a
temporary restraining order in the Superior Court of Bibb County before the Quiet
Title Action was removed to this Court to prevent Popli from foreclosing on the
Property until the parties had a chance to litigate the validity of the Security Deed,
but the motion was denied.   In the order, the Superior Court relied on the deposition
testimony of Popli, Kumar, and Hale, and made the following findings:

> Defendant [Popli] testified that when he gave Mr. Kumar $500,000.00
> in 2019, there was an agreement that Mr. Kumar would pay him back.
> Attorney Joshua Hale testified that Mr. Kumar admitted that he owed
> Defendant $500,000.00 at the time he signed the Deed to Secure Debt.
> While there was some confusion as to why Mr. Kumar owed the money
> or what he owed the money for, it is clear that he owed the money, and
> he signed the security deed in spite of the fact that he has now signed
> an affidavit on behalf of Durga, alleging that Durga does not owe the
> money.   The fact that Mr. Kumar did, in fact, sign the security deed on
> January 29, 2021, validates and lends credibility to the testimony of
> Attorney Joshua Hale and Defendant Madan Popli.
>
> The deposition testimony and Mr. Kumar's signature on the Deed to
> Secure Debt tends to show that the deed was valid, notwithstanding that
> Defendant Popli initially attempted to file an improper mechanic's lien
> as a means to enforce his agreement with Mr. Kumar.   It is not relevant
> that Attorney Joshua Hale testified that the $500,000.00 was not
> transferred through his law firm's trust account.   Defendant Popli does
> not contend that he gave Mr. Kumar any money when the Deed to
> Secure Debt was executed.   His testimony was that he loaned Mr.
> Kumar the money sometime in 2019 and did not require any writing to

22

> memorialize Mr. Kumar's agreement to repay it at that time because
> they were close like family members-they were "cousins."  After the
> parties had a falling out, they memorialized the oral agreement in
> writing by means of the Deed to Secure Debt.

*See* Order Denying Temporary Restraining Order (citations omitted).

Popli now argues that the doctrine of the law of the case prevents this Court from making a final decision on the validity of the Security Deed after it conducted a full trial and heard evidence because of the Superior Court's interlocutory order, which was based only on deposition testimony, affidavits, and pleadings.  Popli is incorrect.  First, the Court notes that Popli's argument would prevent any trial court from modifying the findings in its interlocutory order, thereby negating the need for conducting a trial at all.  That is not how the system works.  Alacrity was entitled to a final judgment on the matter after discovery and dispositive motions or a further trial.

Second, the law of the case doctrine is inapplicable in this situation because there has not been a final decision on any issues in this case.  As the Supreme Court of Georgia has pointed out "in granting or denying an interlocutory injunction, a trial court cannot make a final determination of the issues unless the interlocutory hearing is consolidated with the trial of the action on the permanent injunction as authorized by OCGA § 9-11-65(a)(2)."  *Sneakers of Cobb Cnty. v. Cobb Cnty.*, 265 Ga. 410, 410, 455 S.E.2d 834, 835 (1995) (citing *Georgia Canoeing Assn. v. Henry*, 263 Ga. 77, 428 S.E.2d 336 (1993)).  "Thus, the grant or denial of an interlocutory injunction . . . does not establish the law of the case for the trial on the merits."  *Id.*; *see also Lanier Const., Inc. v. Carbone Properties of Mobile, LLC*, 253 F. App'x 861, 863 (11th Cir.

2007) ("We have held that if a district court decision is interlocutory and subject to reconsideration, any constraints of the law-of-the-case doctrine are inapplicable"); *Gregg v. U.S. Indus., Inc.*, 715 F.2d 1522, 1530 (11th Cir.1983) ("Ordinarily law of the case applies only where there has been a final judgment and not to interlocutory rulings.").  Because the Superior Court's interlocutory order did not fix the law of the case, this Court may make a final decision on the validity of the Security Deed.

## C. **Authority Under the LLC Act**

The Court will next consider whether the Security Deed is invalid because Kumar allegedly lacked corporate authority to grant Popli a Security Deed covering the Property that belonged to Durga to secure his personal obligation.  It is not disputed that at the time Kumar signed the Security Deed Durga did not have an operating agreement.  *See* [Doc. 37, p. 23].  Thus, the Court must look to the Georgia Limited Liability Company Act (the "LLC Act") to determine whether Kumar had authority to sign the Security Deed.

The LLC Act provides in part:

> Unless the articles of organization or a written operating agreement vests management of the limited liability company in a manager or managers, management of the business and affairs of the limited liability company shall be vested in the members, and, subject to any provisions in the articles of organization or a written operating agreement, the members shall have the right and authority to manage the affairs of the limited liability company and to make all decisions with respect thereto.

O.C.G.A. § 14-11-304(a).  Notwithstanding that the second paragraph of the Note refers to the "Borrower" – which was Kumar – as the majority member, the testimony

24

indicated that when Kumar signed the Security Deed, he and Lal each held 50% of the shares of Durga, and no evidence was introduced to show that Lal acknowledged that Kumar was the majority member at this time.  The evidence also indicated that both Kumar and Lal operated the company as members because no manager had been elected at that time.[19]

Section 301 of the LLC Act lays out the duties and authority of members of a limited liability company.  It states in part:

> Except as provided in subsection (b) of this Code section, every member is an agent of the limited liability company for the purpose of its business and affairs, and the act of any member, including, but not limited to, the execution in the name of the limited liability company of any instrument for apparently carrying on in the usual way the business and affairs of the limited liability company of which he or she is a member, binds the limited liability company, unless the member so acting has, in fact, no authority to act for the limited liability company in the particular matter, and the person with whom he or she is dealing has knowledge of the fact that the member has no such authority.

O.C.G.A. § 14-11-301(a).  Section 301(c) of the Act provides:

> ***[a]n act of a manager or a member that is not apparently for the carrying on in the usual way the business or affairs of the limited liability company does not bind the limited liability company*** unless authorized in accordance with a written operating agreement at the time of the transaction or at any other time.

---

[19] The Court notes that below Kumar's signature on the Security Deed is his handwritten name and another handwritten word that appears to say "owner."  When Durga sold the Property to Alacrity, below Kumar's signature on each of the documents is his typed name and the typed word "manager."  The absence of the word manager below Kumar's signature on the Security Deed would indicate that Kumar did not sign the Security Deed as the manager of Durga, but merely as a member.  Further, as mentioned earlier, the Sale Documents contain Durga's Operating Agreement dated May 4, 2021, and signed by each member of Durga.  The Operating Agreement states in part, "[t]he members hereby unanimously elect Rajesh Kumar to serve as the ***initial*** Manager of the Company."  This indicates that Durga did not have a manager until May 4, 2021, and that Kumar did not act as the manager of Durga when he signed the Security Deed on January 29, 2021.

O.C.G.A. § 14-11-301(c) (emphasis added).

Popli argues that even if Kumar did not have the actual authority to sign the Security Deed and pledge Durga's property, pursuant to Section 301(a) Kumar had apparent authority to sign the Security Deed on behalf of Durga because the granting of the Security Deed was within the usual business and affairs of Durga and Popli had no knowledge that Kumar lacked actual authority.   Even if the "apparent authority provision" of the LLC Act applied to the issue before the Court – which the Court will later explain it does not – Kumar did not have apparent authority to grant the Security Deed because the granting of a security deed covering Durga's only piece of property was "not apparently for the carrying on in the usual way the business and affairs of the limited liability company."

Popli cites to an Eleventh Circuit Court of Appeals decision dealing with section 301(b)(2), which is the "apparent authority provision" of the LLC Act as it relates to managers of a limited liability.[20] *Guarantee Co. of N. Am. v. Gary's Grading & Pipeline Co.*, 746 F. App'x 831 (11th Cir. 2018).  Popli misses the fact that in that case the Eleventh Circuit Court of Appeals made clear that the "carrying on in the usual way" language from section 301(c) means an act that a member or manager had performed in the past.  *See id.* at 836 ("Further, it is undisputed that GCNA believed Christopher had on a prior occasion executed a bond agreement on behalf of Pine Plantation and Gary's Grading in the exact same manner as he did here, and

---

[20] Upon review, it appears that O.C.G.A. §§ 14-11-301(a) and (b)(2) mirror each other with the simple exception that (a) applies to members and (b)(2) applies to managers.

without signatures from Gary or Peter Opolka.") (citing *Fielbon Dev. Co., LLC v. Colony Bank of Houston Cty.*, 290 Ga. App. 847, 851, 660 S.E.2d 801 (2008) (interpreting an identical "carrying on in the usual way" phrase in O.C.G.A. § 14-11-301(c) to encompass an act the manager had done in the past)). Furthermore, it would be a rare multi-member LLC indeed that would have the pledging of all of its assets as collateral for the personal obligations of one of the members be within the scope of its usual way of carrying on of its business.

No evidence indicated that Kumar had ever previously signed a deed to secure debt pledging Durga's property, let alone one securing an alleged personal debt. Further, no evidence indicated that Popli believed Kumar had on prior occasion granted a deed to secure debt covering Durga's property. In fact, as Alacrity points out, according to the Bibb County, Georgia real estate records, the only time Durga ever purportedly entered into an agreement to grant a security interest in the Property was the Security Deed to Popli.[21] Based on Eleventh Circuit precedent, which holds that "carrying on in the usual way" connotes an act which has been performed more than once, the Court finds that when Kumar granted the Security Deed to Popli, an act which Kumar only performed this one single time, Kumar was not "carrying on in the usual way the business or affairs of" Durga. *See* O.C.G.A. §

---

[21] The Court may take judicial notice of the Bibb County, Georgia real estate records as public records. *See Progressive Mt. Ins. Co. v. Middlebrooks*, 805 F. App'x 731 (11th Cir. 2020) (taking judicial notice of state court filings as public records); *see also Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (taking judicial notice of complaint as public record).

14-11-301(c).  Therefore, Kumar did not act with apparent authority to bind Durga by signing the Security Deed as collateral for his alleged personal obligation.

Even had Popli's apparent authority argument been availing, the "apparent authority provisions" of the LLC Act are superseded by another section of the LLC Act.  Specifically, Section 308(b)(3) provides in part:

> Unless otherwise provided in the articles of organization or a written operating agreement, the unanimous vote or consent of the members shall be required to approve the following matters: . . . (3) The sale, exchange, lease, or other transfer of all or substantially all of the assets of the limited liability company.

O.C.G.A. § 14-11-308(b)(3).

Popli argues that the "apparent authority provisions" in section 301 of the LLC Act override section 308(b) because language in section 308(a) states in part "[e]xcept as otherwise provided *in this chapter* or in the articles of organization or a written operating agreement, and subject to subsection (b) of this Code section. . ."  O.C.G.A. § 14-11-308(a)(emphasis added).   While section 308(a) does in fact provide an exception for other parts of the LLC Act, such as potentially the "apparent authority provisions," section 308(b) contains no such exception.  *See Keene Corp. v. United States*, 508 U.S. 200, 208, 113 S. Ct. 2035, 2040, 124 L. Ed. 2d 118 (1993) ("[W]here Congress includes particular language in one section of a statute but omits it in another ..., it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.")  (citation and punctuation omitted).  The language of section 308(b) makes clear that only articles of organization or a written operating agreement will negate the unanimous consent requirement for a limited

28

liability company to sell, exchange, lease, or otherwise transfer all or substantially all of the assets of the limited liability company. *See Mitchell v. State*, 343 Ga. App. 116, 117, 806 S.E.2d 226, 228 (2017) ("Pursuant to the rules of statutory construction, we presume that the General Assembly meant what it said and said what it meant. To that end, we must afford the statutory text its plain and ordinary meaning, we must view the statutory text in the context in which it appears, and we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would.").

As already noted, no articles of organization or written operating agreement existed at the relevant time period here, so section 308(b) applies. Further, the evidence and testimony were conflicting as to whether Kumar only held 50% of the shares of Durga or was the "majority member" when he executed the Security Deed,[22] but there certainly was no evidence that Lal, the only other member of Durga, consented to Kumar granting Popli the Security Deed on behalf of Durga, and Kumar testified that Lal did not consent. It being clear that Kumar did not have the unanimous consent of the members of Durga,[23] the only remaining issue to decide is whether the granting of the Security Deed constituted a "sale, exchange, lease, or

---

[22] In the absence of a written agreement or other evidence indicating that Kumar and Lal both acknowledged that Kumar held a specific percentage of Durga in excess of 50%, they should be presumed to be 50/50 members, which is in line with Kumar's testimony, but the Court need not decide whether Kumar held 50% or a majority of the membership interest because Kumar lacked authority either way.

[23] This entire issue possibly could have been avoided had the transaction culminating in the Security Deed been documented the way Alacrity's purchase of the Property was documented, which included a unanimous written consent of the members and a written operating agreement.

other transfer of all or substantially all of the assets of the limited liability company"
under section 308(b)(3). O.C.G.A. § 14-11-308(b)(3).

In Georgia, a "deed to secure debt transfers legal title to the lender, while a
mortgage only acts as a lien on the property." *Glob. Educ.-SAT Acad., LLC v. DF
Duluth, LLC*, 366 Ga. App. 775, 776–77, 884 S.E.2d 37, 40 (2023), reconsideration
denied (Feb. 16, 2023) (citing *Cole v. Cates*, 110 Ga. App. 820, 823 (1) (c), 140 S.E.2d
36 (1964) ("In this State a deed to secure a debt is not the same as a mortgage. Such
a deed conveys title; a mortgage is only a lien.")).  "Although a deed to secure debt
conveys legal title in the property to the lender, the borrower retains an equitable
title and the right to regain or redeem legal title by payment of the secured
indebtedness; the borrower also retains the right of possession." *Id.*  Moreover, the
Georgia Code states:

> "Whenever any person in this state conveys any real property by deed to
> secure any debt . . . *[s]uch conveyance shall be held by the courts to
> be an absolute conveyance*, with the right reserved by the grantor to
> have the property reconveyed to him upon the payment of the debt or
> debts intended to be secured agreeably to the terms of the contract, and
> shall not be held to be a mortgage."

O.C.G.A. § 44-14-60 (emphasis added).  As case law and the Georgia Code make clear,
a deed to secure debt, such as the Security Deed in this case, constitutes an absolute
conveyance and transfers legal title to the subject property.  At the time Kumar
signed the Security Deed, Durga owned no other real property but perhaps owned

some personal property that was incidental to the ownership of real property.[24]  Thus, when Kumar executed the Security Deed, he transferred substantially all of the assets of Durga, and he did so without the unanimous consent of the members of Durga as required by the LLC Act.  Because Durga's sole piece of real estate from which it generated its income constituted substantially all of its assets, and Kumar did not have the consent of any other members of Durga to grant the Security Deed covering the Property, Kumar did not have authority under the LLC Act to grant the Security Deed, and it is therefore invalid.

## D. Consideration

Under Georgia law, "a security deed . . . is a contract."  *Sheely v. Bank of Am., N.A.*, No. 1:15-CV-1109-TCB, 2017 WL 6334835, at *3 (N.D. Ga. Sept. 8, 2017), aff'd, 738 F.App'x 603 (11th Cir. 2018) (citing *Gordon v. S. Cent. Farm Credit, ACA*, 213 Ga. App. 816, 817, 446 S.E.2d 514, 515 (1994)).  "A fundamental tenet of contract law is that a contract must be supported by consideration."  *Douglas v. Johnson Real Est. Invs., LLC*, No. 1:11-CV-00567-SCJ, 2011 WL 13177544, at *1 (N.D. Ga. Oct. 11, 2011), aff'd, 470 F. App'x 823 (11th Cir. 2012); *see also* O.C.G.A. § 13-3-1 ("To constitute a valid contract, there must be parties able to contract, a consideration

---

[24] Popli argues that the Property may not constitute all or substantially all of the assets of Durga under section (b)(3) because Alacrity did not put forth any evidence of the revenues of Durga for this time period.  The Court finds this argument unavailing.  Durga primarily operated as a real estate holding company and the Property, a gas station, was Durga's sole piece of real estate.  Any personal property located on the Property was incidental to its use as a gas station.  Further, evidence showed that the Property either generated revenue from goods sold on the Property or from rents from tenants when the Property was leased.  It is unclear who owned the inventory in the store at the time of the transfer, but even if some or all of it was owned by Durga instead of Anika, it is clear that the value of the Property was 90% or more of the value of the assets of Durga.  The Court finds that the Property constituted all or substantially all of the assets of Durga for purposes of section (b)(3).

moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate."). Alacrity argues that the Security Deed, as a contract between Durga and Popli, lacks consideration and is therefore invalid. Contrary to Popli's assertion, "[p]arol evidence is admissible . . . to show want or failure of consideration." *Weintraub v. Cobb Bank & Tr. Co.*, 249 Ga. 148, 149, 288 S.E.2d 553, 554 (1982).

Popli first argues that because the Security Deed was executed under seal and contained a recitation of consideration, the Security Deed is valid. As Popli notes in a post-trial brief:

> Here, the [Security Deed] specifically states that consideration for the deed is the sum of $500,000.00. It further states, that Kumar acknowledged receipt of such sum. Even if the deed shows consideration of only one dollar, that would be sufficient. Under Georgia law, the recital of $500,000.00 within the four corners of the deed is sufficient to evidence consideration. Accordingly, the [Security Deed] is valid and does not fail for lack of consideration. . . In the instant case, the Deed to Secure Debt is under seal and the consideration of $500,000.00 was recited therein. As a matter of law, this is in and of itself is sufficient to rebut any defense or claim of failure of consideration as a matter of law. Accordingly, the Deed to Secure Debt is valid.

*See* [Doc. 37, p. 15-16].

The Georgia Code, however, states that the "consideration of a deed may always be inquired into when the principles of justice require it." O.C.G.A. § 44-5-30. Further, "although a contract under seal imports consideration, the defense of failure of consideration can be asserted." *Autrey v. UAP/GA AG Chem, Inc.*, 230 Ga. App. 767, 770, 497 S.E.2d 402, 405 (1998).

Popli is correct that "any nominal consideration recited in sealed instruments is sufficient as a matter of law." *Id.* (citing *Jolles v. Wittenberg*, 148 Ga.App. 805, 807(2), 253 S.E.2d 203 (1979)). The Court has reviewed the cases cited by Popli along with other cases where nominal consideration is recited, and notes that Georgia courts do hold that those contracts do not fail for lack of consideration even if the recited dollar amount was not actually paid. *See Jolles v. Wittenberg*, 148 Ga. App. at 807 (contract with monetary consideration of $1 recited, which sum was noted as received but was not actually paid, was a valid contract despite the failure to actually pay the recited amount because the contract "creates an obligation to pay that sum, which can be enforced by the other party"); *Nelson v. Woods*, 205 Ga. 295, 295, 53 S.E.2d 227, 227 (1949) ("The fact that a recited cash consideration [of $10] was not actually paid does not invalidate such contract. It creates an obligation to pay that sum, which can be enforced by the other party."); *S. Bell Tel. & Tel. Co. v. Harris*, 117 Ga. 1001, 44 S.E. 885, 886 (1903) ("It is said, though, that the judge could have found from the evidence that Mrs. Harris never received any consideration for the contract; that the sum stated in the contract as the consideration moving her to execute it was never, in fact, paid to her, and she never received the benefit of it. Granting that this is so, this would not make the contract a nudum pactum, and for this reason unenforceable. It expresses a consideration of $1, and the payment of this sum may be enforced by Mrs. Harris. The contract binds Mrs. Harris to allow the use of her land in the manner therein specified, and creates a corresponding obligation on the

part of the company to pay the sum named as the consideration for the right granted it.").

The case at hand differs from the cases of nominal consideration in one important way: the consideration listed in the Security Deed was not nominal consideration, but instead was $500,000.[25]  This distinction is important because the Supreme Court of Georgia has indicated that it is the recital of nominal consideration that gives rise to an implied promise to pay the listed consideration which becomes enforceable by the other party.  *Smith v. Wheeler*, 233 Ga. 166, 167, 210 S.E.2d 702, 704 (1974) ("We have held many times that the recital of the one-dollar consideration gives rise to an implied promise to pay which can be enforced by the other party.") (citing *Jones v. Smith*, 206 Ga. 162, 56 S.E.2d 462 (1949); *S. Bell Tel. & Tel. Co. v. Harris*, 117 Ga. 1001; *Nathans v. Arkwright*, 66 Ga. 179 (1880); *Blount v. Lynch*, 24 Ga. App. 217, 100 S.E. 644 (1919)).

Because the Security Deed in this case lists consideration far in excess of a nominal amount, the Court finds the above-mentioned nominal consideration cases distinguishable and holds that the $500,000 listed as consideration did not constitute an implied "promise to pay."  Rather, and as Popli testified, the $500,000 listed as consideration was understood to be for an amount Popli had allegedly already paid to Kumar, and not Durga.[26]

---

[25] Unlike the nominal consideration cases, $500,000 is not an amount that could easily be tendered to Popli, and if it was now tendered to support the Security Deed it could be used to repay the debt.
[26] Popli also cites to *Williams v. Lockhart*, 221 Ga. 343, 344 (1965) and *Slaick v. Arnold*, 307 Ga. App. 410 (2010) for the proposition that even if there was no consideration for the deed, in the absence of

Popli also argues that the Security Deed is supported by consideration because it memorialized the $500,000 antecedent debt Kumar owed Popli. *See Beazley v. Georgia R.R. Bank & Trust Co.*, 144 Ga.App. 215, 241 S.E.2d 39 (1977) ("No consideration is necessary for an instrument given in payment of an antecedent obligation of any kind."). Still, for an antecedent obligation to constitute consideration, an antecedent obligation must actually exist.

Aside from Popli's own testimony, no evidence other than the Note exists that shows that Kumar had an obligation to Popli for anything, let alone $500,000.[27] No bank statements evidence this money ever changing hands, and no receipts for this alleged loan exist. The Court finds Popli's testimony that he walked into the gas station on the Property with a bag full of $500,000 in cash to be completely uncredible. First, Kumar has maintained that he never accepted this amount or any amount of money from Popli and no documents contemporaneous with the so-called loan exist, and Lalani, who Popli testified gave him some large portion of the $500,000, also

---

some equitable ground such as fraud, a voluntary deed will not be cancelled on the ground of lack of consideration. These cases are also not applicable because the Security Deed in this case was not a voluntary deed, rather it was allegedly founded on the valuable consideration of $500,000. *See Stokes v. McRae*, 247 Ga. 658, 659, 278 S.E.2d 393, 395 (1981) ("[A] voluntary conveyance or deed is one without any valuable consideration. A valuable consideration is founded on money, or something convertible into money, or having a value in money.") (citations omitted).

[27] The Superior Court of Bibb County appeared to rely on the Deposition of Joshua Hale as a factor indicating that Kumar acknowledged having an obligation to Popli at the time the Note and Security Deed were signed, but this Court notes that having an "obligation" does not necessarily mean that Popli actually advanced cash to Kumar that needed to be repaid. Hale did not testify at the trial before this Court, and the transcript of his deposition was not entered into evidence. Nevertheless, Hale's deposition transcript was a part of the record transmitted from the Superior Court when this matter was removed to this Court, so this Court has reviewed that transcript. While it is true that Hale testified that Kumar acknowledged to Hale that he had an obligation to Popli, Hale's deposition transcript makes clear that the transactions and interactions between Durga, its members, Kumar, and Popli, and others were confusing at best. When asked if he would be surprised that Popli gave Kumar $500,000 in cash, Hale responded, "yes I would be surprised." *See* Transcript of Deposition of Joshua Hale [Doc. 1, p. 431].

denied ever giving Popli any amount of money, and no documents exist to support that he did.  And again, the record is clear that Durga never got anything from Popli or benefitted in any way from this alleged $500,000 obligation from Kumar to Popli.

Second, while the Court is skeptical that Popli ever loaned Kumar anything, even taking Popli at his word, his own testimony showed that the so-called $500,000 cash loan still could not serve as consideration for the Security Deed.  Recall that Popli testified that after he allegedly gave Kumar the $500,000 cash, Kumar allegedly paid that money to the state on Popli's behalf to settle a debt that Popli owed.  Thus, according to Popli's own testimony, Kumar no longer would have owed Popli anything.  In sum, the Court finds that the alleged $500,000 cash loan cannot serve as consideration for the Security Deed on an antecedent debt theory or any other theory because either the money was never actually loaned to Kumar in the first place, or even if it was, based on the story that Popli told, Kumar paid the money to the state on Popli's behalf and satisfied both Popli's obligation to the state and his obligation to Popli.  *See Harris v. W. Cent. Georgia Bank*, 335 Ga. App. at 116, ("[A] deed purporting to secure a debt which never existed or which has been discharged is not a valid instrument and may be regarded as no more than a cloud on the title.") (citing 3 Daniel F. Hinkel, Pindar's Ga. Real Estate Law & Procedure § 21:31 (7th ed. 2015)).

Even if Popli does have a claim against Kumar personally for $500,000, it is difficult to see how that could serve as consideration for the Security Deed that pledged Durga's, not Kumar's, property.  Durga received nothing of value from this

transaction. No testimony or evidence indicated that the alleged $500,000, if it was loaned at all, went to Durga or was somehow used for Durga's benefit.

The Supreme Court of Georgia touched on this issue in *D. A. D., Inc. v. Citizens & S. Bank of Tucker*, 227 Ga. 111, 179 S.E.2d 71 (1971). In that case, Dickson, the secretary and treasurer of D.A.D., Inc. ("DAD"), signed a note on behalf of DAD in favor of the bank and also gave the bank a security deed on property that belonged to DAD as collateral for the note. *Id.* at 112. The evidence bore out that the proceeds of the loan did not go to DAD, that DAD received no benefit from the loan at all, and also that DAD did not give Dickson authority to execute the note or ratify his acts. *Id.* at 116. On these facts, the Supreme Court of Georgia held that DAD was not liable on the note. *Id.* The Court stated:

> The rule that a promissory note without consideration, executed in the name of a corporation by one of its officers, and payable to such officer individually, is void as against the corporation, even as against a bona fide holder for value, is not based upon the theory that such an officer may not be in fact authorized to bind the corporation by the execution of its note given for a proper purpose, but ***rests upon the theory that none of its officers is or can be empowered to gratuitously pledge the assets of the corporation***, and that one taking such a note is bound to take cognizance that the agent of the corporation in thus seeking to bind the corporation, might have been acting not in its interest and for its benefit, but for the benefit of himself.

*Id.* at 114-115 (citation and punctuation omitted) (emphasis added). The Court's decision was tied to both the lack of corporate authority and the lack of any benefit flowing to the corporation due to the principal's failure to apply funds from the loan to the corporation, which (assuming Popli actually loaned Kumar the $500,000) is

precisely the situation the case at hand presents because no evidence at all indicated that any of the alleged loan money went to Durga's benefit.

Popli alternatively argues that his dismissal of the lawsuit on the claim of lien constitutes consideration for the Security Deed. The Court first notes that the Security Deed does not list settlement of a dispute as consideration or even allude to any settlement. *See Tafel v. Lion Antique Invs. & Consulting Servs.*, No. 1:10-CV-3260-TWT, 2011 WL 3846522, at \*2 (N.D. Ga. Aug. 29, 2011), aff'd, 459 F. App'x 847 (11th Cir. 2012) ("Furthermore, the consideration must be stated in the contract or at least be ascertainable from the contract."); *Lewis v. Ikner*, 349 Ga.App. 21, 825 S.E.2d 443 (Ga. Ct. App. 2019) (limiting possible consideration for a note to the purported monetary consideration recited in the note). Even so, Popli's argument that the alleged settlement of the lawsuit on the claim of lien constituted consideration for the Security Deed is unavailing.

"Where parties enter into an agreement compromising and settling a claim about which there is a bona fide dispute, they are bound by the agreement, even though one of the contentions thereafter appears to be without foundation in law." *Matrix Fin. Servs., Inc. v. Dean*, 288 Ga. App. 666, 668, 655 S.E.2d 290, 293 (2007) (citation and punctuation omitted). "While the law recognizes that the compromise of a doubtful claim will support a settlement agreement, that claim must be asserted in good faith." *Id.*

> Although the courts will not inquire into the validity of a claim which was compromised in good faith, ***there must generally be reasonable grounds for a belief in order for the court to be convinced that the***

> ***belief was honestly entertained by the person who asserted it***.
> Sufficient consideration requires more than the bald assertion by a
> claimant who has a claim, and to the extent that the validity or
> invalidity of a claim has a bearing upon whether there were reasonable
> grounds for believing in its possible validity, evidence of the validity or
> invalidity of a claim may be relevant to the issue of good faith.

*Id.* at 669 (emphasis added).

Popli argues that at the time he filed the claim of lien and the lawsuit thereon, he "in good faith believed that he was doing what was required to secure the money." *See* [Doc. 37, p. 13]. This is not the standard. In order for the claim of lien and lawsuit thereon to be a bona fide dispute, settlement of which could serve as consideration for the Security Deed, Popli had to have a good faith belief that the claim of lien and the lawsuit thereon were valid, and there must be "reasonable" grounds for that belief. The reasonable person standard is an objective standard, not a subjective standard, but Popli cannot satisfy either. It is undisputed that Popli provided no labor, services, or materials to support the claim of lien, and Popli himself admitted that he provided no labor, services, or materials, so he could not have reasonably had a good faith belief in the validity of the claim of lien or the lawsuit thereon. To the contrary, a reasonable person who provided no labor, services, or materials would know that the claim of lien was completely invalid and that the lawsuit thereon had no chance of success. Settlement of such claim cannot constitute consideration for the Security Deed because such a claim was not a "bona fide dispute" asserted in good faith. On the contrary, Popli's claim of lien and lawsuit thereon constituted yet another attempt to improperly wrestle this Property back from its rightful owners.

Popli did testify that he held an off-the-record interest in Durga, just like he said he had in Robin Globe. [28]  Of course, like so many other matters in this case, there were no documents or third-party testimony to support such claims.  After hearing the testimony, it seems this is a possible factual explanation for Kumar signing the Note evidencing some type of obligation to Popli, that Kumar may owe him a piece of his membership interest in Durga – whatever that may mean.  The Court cannot really come up with any other plausible explanation for why Kumar signed the Note.[29]  But Popli did not assert that this supposed off-the-books membership interest – or really at best an off-the-books piece of Kumar's interest in Durga – was the consideration to support the Note and, therefore, the Security Deed.  Regardless, Popli's testimony was clear that the alleged consideration for the Security Deed was hard cash money he loaned to Kumar as opposed to Kumar's obligation to pay him for an off-the-books portion of Kumar's membership interest in Durga.

As previously mentioned, the parties are bound by the consideration listed in the Security Deed and the Security Deed did not list this possible interest as consideration.  *See Tafel v. Lion Antique Invs. & Consulting Servs.*, No. 1:10-CV-3260-TWT, 2011 WL 3846522, at *2; *Lewis v. Ikner*, 349 Ga.App. 21, 825 S.E.2d 443.

---

[28] Any such off-the-books interest in Durga is probably too vague to be enforceable, and membership interests are not typically enforceable by promissory notes and collateral of the company in which you allegedly hold a membership interest, but rather through distribution rights under an operating agreement agreed to by all the members, which is clearly lacking here.

[29] Although the Court thinks this may be a plausible explanation for why Kumar signed the Note, there was no evidence to support it and the witnesses did not testify that this was the consideration for the Note, and the Court cannot just make up the facts.  Because the Court does not have to reach a definitive conclusion about whether Kumar has some obligation to Popli in order to decide the ultimate issues in this case, the Court will allow some other court to decide the obligations between those two non-debtors.

Second, nothing evidenced that Popli even had any off-the-record membership interest in Durga aside from his own testimony.  Kumar denied that this was the case, and the other members did not testify.  Without any more evidence that Popli actually held an off-the-books membership interest and used that interest to somehow bargain for the Security Deed *with the consent of the other members*, the Court cannot find that this vague and alleged membership interest – or piece of Kumar's interest – could serve as consideration.  But it is clear that any such promise by Kumar to give Popli a portion of his membership interest in Durga could not be consideration for Durga to validly pledge all of its assets to Popli without the consent of all the members of Durga.

The fact that the Note was signed by Kumar personally, and not by any of the other members of Durga, would seem to indicate that this was a personal obligation of Kumar[30] and not the other members, and Kumar cannot pledge a priority security interest in all of the assets of Durga to secure his alleged personal obligation to Popli without the consent of the other members.  There was certainly nothing in the record to show that this consent was given or why it would be given to their financial detriment.  This is an excellent example of why the LLC Act requires the unanimous consent of members for such a transaction: to prevent litigation over instances such as this where one member tries to collateralize his personal obligations with the assets of the LLC to the detriment of the other members of the LLC.

---

[30] Alacrity argues that Popli fraudulently induced Kumar into signing the Note and Security Deed or that Kumar signed under duress, but the Court's decisions on other issues in this matter render the fraud and duress issues moot and the Court need not decide them.

To illustrate the inappropriateness of this type of transaction, let us look at how the Security Deed would have adversely affected Pawan and Lal, the other members, and how it would have benefited Kumar.   The purchase price was $1,350,000.  Without the Security Deed, Kumar (55%) would have gotten $742,500, Pawan (29%) $391,000, and Lal (16%) $216,000.   If the Security Deed was enforceable, there would be $500,000 less to distribute to the members after payment of Kumar's personal obligation, so Kumar would get another $467,500, for a total benefit, of $967,000, an *increase* of $245,000, whereas Pawan would only get $246,500, a decrease of $144,500, and Lal would only get $136,000, a decrease of $80,000.  This illustrates why the LLC Act requires the unanimous consent of the members for such a transaction and why the Georgia courts will not enforce such a Security Deed against an LLC, particularly one which received no consideration from the transaction.  *See D. A. D., Inc. v. Citizens & S. Bank of Tucker*, *supra*.

Because the Security Deed was also not supported by consideration, the Court holds that it is invalid.  *See Tafel v. Lion Antique Invs. & Consulting Servs.*, 459 F. App'x 847, 848 (11th Cir. 2012) (affirming district court opinion that held that neither the recited consideration nor a suggested bargain and settlement provide adequate consideration for a note).

## DAMAGES TO THE PROPERTY AND RENT

**A. Is Alacrity Entitled to Market Rent in Excess of the State Court Ordered $5,000?**

Alacrity asks this Court to award damages equal to the reasonable rental value of the Property for the months that Popli and his subtenant remained on the Property during the pendency of Popli's appeal of the Eviction Action, a period of 11 months from September 2021 through July 2022. The State Court of Bibb County ordered Popli and his subtenant to pay into the registry of the court to be held for Alacrity $5,000 a month – the amount stated in the Handwritten Agreement between Popli and Anika, which payments were made and have since been dispersed to Alacrity. Alacrity contends that it is owed an amount in excess of the $5,000 a month because that amount did not equal the reasonable rental value of the property. Indeed, "[a] tenant at sufferance is liable for the reasonable rental value of the premises, irrespective of the amount contracted to be paid during a previous term." *Jefferson v. Kennedy*, 41 Ga. App. 672, 154 S.E. 378 (1930) (citing *Stanley v. Stembridge*, 140 Ga. 750, 79 S. E. 842 (1913).

Following Alacrity's purchase of the Property, Alacrity filed the Eviction Action against Popli and his subtenant arguing that they were tenants at sufferance and Alacrity was entitled to possession of the Property. The Court of Appeals of Georgia has defined the tenant at sufferance, as opposed to the tenant at will, as follows:

> The tenant at sufferance enters lawfully and holds over wrongfully without the landlord's assent or dissent; while the tenant at will holds by the landlord's permission. A tenant at will is always in by right, evidenced by permission, express or implied, of the landlord. A tenant

at sufferance holds over by wrong, and he is in possession, not by permission of the landlord, but as a result of his laches or neglect.

*Drury v. Sec. State Bank*, 328 Ga. App. 39, 41, 759 S.E.2d 635, 638 (2014).  While Popli and his subtenant may have initially entered the Property lawfully pursuant to the Handwritten Agreement, the State Court of Bibb County determined in the Eviction Action that Alacrity was entitled to possession, which means that Popli and his subtenant became tenants at sufferance by their refusal to vacate the Property.

As mentioned above, Popli appealed the order of the State Court and was ordered to pay $5,000 per month in rent into the registry of the court during the pendency of the appeal pursuant to O.C.G.A. § 44-7-56, which states in relevant part:

> If the judgment of the trial court is against the tenant and the tenant appeals this judgment, the tenant shall notify the trial court of his or her appeal and pay into the registry of the reviewing superior or state court all sums found by the trial court to be due for rent in order to remain in possession of the premises; and [t]he tenant shall pay all future rent as it becomes due into the registry of the reviewing superior or state court pursuant to paragraph (1) of subsection (a) of Code Section 44-7-54 until the issue has been finally determined on appeal.

O.C.G.A. § 44-7-56(b)(3)-(4).  This code section directs the trial court to determine all past-due sums a tenant owes for rent to remain in possession of a premises during appeal, but for future rents that come due during the appeal the trial court is directed to reference O.C.G.A. § 44-7-54(a)(1), which states:

> In any case where the issue of the right of possession cannot be finally determined within two weeks from the date of service of the copy of the summons and the copy of the affidavit, the tenant shall be required to pay into the registry of the trial court: ***All rent and utility payments which are the responsibility of the tenant payable to the landlord under terms of the lease which become due after the issuance of the dispossessory warrant***, said rent and utility payments to be paid as such become due. If the landlord and the tenant disagree as to the

44

amount of rent, either or both of them may submit to the court any written rental contract for the purpose of establishing the amount of rent to be paid into the registry of the court. If the amount of rent is in controversy and no written rental agreement exists between the tenant and landlord, the court shall require the amount of rent to be a sum equal to the last previous rental payment made by the tenant and accepted by the landlord without written objection.

O.C.G.A. § 44-7-54(a)(1) (emphasis added).

The Court notes that the statute says it is for the trial court to determine the amounts due for future rents, and in this case that is exactly what happened when the State Court of Bibb County determined that Popli and his subtenant would owe $5,000 a month to Alacrity during the pendency of the appeal. Alacrity specifically raised the market rental rate argument before the State Court.  It had Klein testify as an expert witness, and Popli also testified to what he thought the market rent was based on his involvement in other stores.  After hearing all that, the State Court determined that Popli should pay $5,000 per month if he appealed the decision and did not make any reservation for the adjustment of the issue depending on the outcome of the appeal.  Because the State Court has adjudicated this issue, it is hard to fathom why Alacrity should now get a second bite at the apple, and the Court is unaware of any authority permitting it to now award more rent due for the time covered by the pendency of the Popli's appeal.[31]

---

[31] That said, this Court believes that $5,000 a month, which equates to only $60,000 a year, is an unreasonably low rate of return on a Property that has twice sold recently for more than $1,000,000, including most recently to Alacrity, an arm's length purchaser, for $1,350,000.  That rental amount is only about a 4% rate of return. The market rent range proposed by Klein of $12,000 to $16,500, with a likely rent of $15,000 per month would result in a return of at least 10%, which is much more realistic.  Nevertheless, this Court believes it is bound by the State Court's order on the issue which was litigated in front of it and the order was affirmed on appeal.

**B. Is Alacrity Entitled to Recover for Damages to the Property?**

Alacrity also argues that it is entitled to monetary damages for the destruction to the Property it discovered upon receiving possession from Popli and his subtenant. The Amendment to the Verified Complaint includes counts for conversion, damage to real property, and indemnification for unpaid utility bills. The Court will now address those in turn.[32]

Alacrity seeks to recover for the loss of alterations and fixtures removed from the Property such as the air conditioning units, cooler units, the point-of-sale system, inventory, and cut wires and electrical systems on a conversion theory. "Conversion consists of an unauthorized assumption and exercise of the right of ownership over personal property belonging to another, in hostility to his rights; an act of dominion over the personal property of another inconsistent with his rights; or an unauthorized appropriation." *Trey Inman & Assocs., P.C. v. Bank of Am., N.A.*, 306 Ga. App. 451, 457, 702 S.E.2d 711, 716 (2010) (citation omitted). "In order to establish a claim for conversion, the complaining party must show (1) title to the property or the right of

---

[32] Alacrity cited to a couple of cases in closing argument for the proposition that Popli would be liable for any damages to the Property up until the point that Alacrity "accepted" the keys as opposed to when Popli "surrendered" the keys through Gaba. *See Warnock v. Soperton Motor Co.*, 77 Ga. App. 16, 19, 47 S.E.2d 753, 755 (1948); *Clark v. Sapp*, 47 Ga. App. 91, 169 S.E. 692, 694 (1933). However, these cases and other cases in that line are not dealing with which party is liable for damages to a property. Instead, these cases are all dealing with whether a tenant's "surrender" of a property acts to nullify a lease such that the tenant is no longer liable for rent. The courts hold that the landlord must "accept" the "surrender" in order for the tenant to no longer be liable for rent under the lease. *See, e.g., Vineyard Vill.-Georgia, Inc. v. Crum*, 136 Ga. App. 335, 337, 221 S.E.2d 208, 210 (1975) ("The rule in this State appears to be that if, pending a tenancy, the tenant becomes dissatisfied and offers to surrender possession to the landlord, and the landlord thereafter remains in possession or exercises a control over the premises inconsistent with the tenant's right of occupation [aka "accepts"], he thereby discharges the tenant from liability for future rent, and a cancellation or rescission of the contract is thus effected by agreement of the parties, express or implied.").

possession, (2) actual possession in the other party, (3) demand for return of the property, and (4) refusal by the other party to return the property." *Id.*

Alacrity also pursues a damage to real property theory under O.C.G.A. § 51-9-1, *et seq.*, to recover for the cutting of electrical wires, removing of the air conditioning units, removing of beverage and food cooler units, removing of the point-of-sale system, and the leaving of the property in a disheveled state. O.C.G.A. § 51-9-1 states, "[t]he right of enjoyment of private property being an absolute right of every citizen, every act of another which unlawfully interferes with such enjoyment is a tort for which an action shall lie." The Georgia Court of Appeals has suggested that this statute applies to both real property and chattels. *Tacon v. Equity One, Inc.*, 280 Ga. App. 183, 188, 633 S.E.2d 599, 603 (2006) ("Bare possession, either of land or a chattel, authorizes the possessor to recover damages from any person who wrongfully in any manner interferes with such possession.") (citations omitted).

At any rate, "Georgia law authorizes the owner of property to bring a civil action to recover damages from any person who either (1) willfully damages the owner's personal property or (2) commits a theft as defined in OCGA § 16-8-2." *Edible IP, LLC v. Google, LLC*, 313 Ga. 305, 308, 869 S.E.2d 481, 484–85 (2022) (citing OCGA § 51-10-6 (a)). O.C.G.A. § 16-8-2, in turn, provides that "[a] person commits the offense of theft by taking when he unlawfully takes or, being in lawful possession thereof, unlawfully appropriates any property of another with the intention of depriving him of the property, regardless of the manner in which the property is taken or appropriated." O.C.G.A. § 16-8-2.

47

After closing the sale with Durga, Alacrity owned the Property, which included the chattels and fixtures inside the store and on the Property, such as the point-of-sale machine, the air conditioning units, the beverage and food cooler units, and any wires and electrical systems.  Once Alacrity gained possession of the Property and the store, it was found destroyed, but as noted above, the testimony about when Alacrity actually gained possession from Popli and his subtenant following the Eviction Action and related appeal differed.

While Gaba testified that he vacated the Property on July 22, 2023, and locked the doors, Lalani testified that Popli and Gaba still had not vacated by July 25, 2022, which led Lalani to continue efforts to coordinate the turnover of the keys and to arrange for Deepesh to meet Gaba and acquire the keys.  Gaba also testified that Deepesh did in fact call him on July 26, 2023, to set up a meeting to hand over the keys.  The timing of this phone call is actually consistent with Lalani's story that Popli and Gaba still had not vacated the Property by July 25, 2023, which prompted Lalani to continue efforts to get the keys and set up the meeting between Gaba and Deepesh.

Gaba testified that he actually met with Deepesh on July 27, 2023, and Lalani testified that this meeting occurred on July 29, 2023, and that Deepesh went to the Property on that day.  Lalani did not personally attend the meeting, but he testified that he remembered the date because Deepesh sent him photographs of the condition of the Property upon getting inside of the store and gave him a report of the condition. Based on the discussion he had with Deepesh, Lalani decided he had to see the store

48

himself, so he went down to inspect it and found it severely damaged. The condition of the Property is such that it is unusable until it is repaired.

Popli's explanation for why he could not possibly have caused all of this damage to the Property was that he was in India at the time. If that was the case, it would have been very easy for Popli to prove this by offering his passport into evidence indicating that he made a trip to India in the second half of July 2022, but Popli failed to do so.[33] What the evidence did show was that Popli and his subtenant maintained possession of the Property until at least July 27, 2023, but possibly until July 29, 2023 – five to seven days after this Court ordered them to vacate – and that once Alacrity was able to gain possession, the Property was found destroyed. The evidence also showed no signs of forced entry, no broken windows, no broken doors, nothing. This clearly shows that someone with keys to the store did this damage to the Property. And who had the keys to the Property? Popli and his subtenant.

Popli also had motive.[34] The Court, having observed the demeanor of the witnesses, found Lalani to be a credible witness and found that Lalani's version of events made more sense given the context of the entire case and the efforts of Popli to retain possession of the Property in opposition to Alacrity's efforts to gain possession of the Property it had purchased. The Court also observed Popli as

---

[33] And even if Popli was out of the country, he could have had someone damage the Property on his behalf.

[34] The Court considered whether Deepesh or someone on his behalf could have damaged the Property because he had the keys for a very brief period of time, but he had no motive. Popli had opportunity and motive. Alacrity's burden is to prove its case by a preponderance of the evidence, not beyond a reasonable doubt, which burden it has clearly and convincingly met.

generally angry throughout his testimony.  Popli seemed frustrated and angry that he had lost the Property despite his wholly mistaken belief that it was still his in whole or in part.  Popli viewed the Property as his despite sales to Robin Globe, Durga, and Alacrity and he viewed the sale to Alacrity as someone taking his property.  Put simply, Popli's testimony and demeanor made him appear vengeful, the kind of person who would take extra-legal actions in total disregard for the law or rightful ownership of the Property.

Popli's own actions throughout this entire ordeal only buttress this.  Ever since he lost the Property to the Houston County District Attorney, Popli has remained fixated on getting it back through any means necessary whether legal or not.  Popli maintained that he had an interest in the Property even after it was seized from him and sold to Robin Globe.  Then, after Robin Globe sold to Durga, Popli filed the false materialmen's lien against the Property unsupported by any factual or legal basis at all.  Then, despite knowing full well that he had provided no labor, materials, or services to support the lien, Popli filed a lawsuit to perfect the lien in order to apply maximum pressure in his crusade to regain the Property.  Then he signed the agreement with Kumar to operate the store and then subleased it to Gaba, wherein Popli signed a written lease as the manager of Durga despite never holding that title, let alone ever actually being a member of Durga at all.  Lalanai also testified about how Popli was trying to negotiate with him prior to Alacrity buying the store from Durga so Popli could acquire it and sell it to Alacrity and then lease it back.  All of this proved Popli capable of taking whatever action he pleased to get this Property

50

back, and when he could not get it back, retaliating by damaging the Property and taking various fixtures and personal property.

The evidence of no forced entry and all of the circumstantial evidence, coupled with Popli's vengeful demeanor, point to Popli – or someone on his behalf – as the party responsible for the damages to the Property.  The Court thus finds that Popli willfully and maliciously damaged Alacrity's property and took Alacrity's property for his own uses.  Popli is thus liable for damages to the extent proven by Alacrity.

So, what were the damages to the store which Alacrity was able to prove? Plaintiff's Exhibit 19 showed that the inventory on April 15, 2021, three weeks before closing, was $68,109, and that Alacrity purchased the inventory at closing, but that Popli purchased half of that inventory from Anika in April.  That would leave inventory of $34,054.50 belonging to Anika or Durga that was sold to Alacrity for which Alacrity should be compensated.

Alacrity has also paid $29,218 to replace the point-of-sale system that was taken, not including the cost to install it.  Alacrity also produced a written invoice for $50,700 to replace and repair the coolers and air conditioning units.  Lalanai testified about other repairs that need to be done, which he estimated at another $150,000 to $170,000, but no written estimates were provided.  Therefore, the damages that Alacrity has proven from the destruction or conversion of its property total $114,000.

Alacrity next seeks to be indemnified by Popli for water and utilities bills that went unpaid while Popli and his subtenant remained in the Property.

> The duty to indemnify may arise by operation of law, independently of contract. If a person is compelled to pay damages because of negligence imputed to him as the result of a tort committed by another, he may maintain an action for indemnity against the person whose wrong has thus been imputed to him.

*U.S. Lawns, Inc. v. Cutting Edge Landscaping, LLC*, 311 Ga. App. 674, 676, 716 S.E.2d 779, 782–83 (2011).  Notably, Lalani testified that Alacrity had not yet paid the outstanding bills, but instead filed a police report to send to the utility companies who may abate the bill or go after the previous tenant.  Because Alacrity has not actually been compelled to pay these bills, it cannot be indemnified by Popli for the cost.  *See Auto-Owners Ins. Co. v. Anderson*, 252 Ga. App. 361, 364, 556 S.E.2d 465, 467 (2001) ("Where no funds have yet been expended, a party's right to seek indemnification has not yet actualized."); *In re Krause, Inc.*, No. 00B71919(N.D. ILL.), 2005 WL 6487214, at *9 (Bankr. N.D. Ga. July 11, 2005) ("The Georgia law delaying the 'actualization' of right to indemnity until after the party seeking indemnity pays a judgment or settlement amount effectuates the policies of avoiding duplicative litigation and of preventing unjust enrichment of the party seeking indemnity that never pays a third party.").

## **PUNITIVE DAMAGES**

Alacrity argues that Popli should be held liable for punitive damages.  In Georgia, "[p]unitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences."  O.C.G.A. §

51-12-5.1(b).  Because Alacrity has shown that Popli or someone acting on his behalf willfully and maliciously caused the damage to the store by clear and convincing evidence, the Court will award punitive damages in the amount of $5,000 against Popli and in favor of Alacrity.

## ATTORNEY'S FEES

Alacrity argues it is entitled to attorneys' fees based on Popli's bad faith and stubborn litigiousness.  Specifically, Alacrity argues that Popli acted in bad faith by filing the false claim of lien and complaint thereon, coercing Kumar into signing the Note and Security Deed, and causing the damages to the Property.  In Georgia,

> The expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them.

O.C.G.A. § 13-6-11.

> OCGA § 13-6-11 authorizes litigation expenses [if] the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense. ... The statutory bad faith must have arisen out of the transaction on which the cause of action is predicated rather than defendant's conduct in defending the case. Bad faith other than mere refusal to pay a just debt may authorize the jury to award attorney fees, provided it is not prompted by an honest mistake as to one's rights or duties but by some interested or sinister motive. ... As to whether the defendant was stubbornly litigious or caused the plaintiff unnecessary trouble and expense, mere refusal to pay a disputed claim, without suit is not sufficient to award attorney fees. The key to the test is whether there is a bona fide controversy. [If] none exists, forcing a plaintiff to resort to the courts in order to collect is plainly causing him to go to unnecessary trouble and expense.

*Bowen v. Laird*, 348 Ga. App. 1, 4, 821 S.E.2d 105, 109 (2018) (citation omitted).

The Court finds that Popli acted in bad faith when he willfully caused the damages to the Property and when he filed the false claim of lien and lawsuit thereon, which had no basis at all and did not constitute a bona fide dispute as the Court already noted.  Thus, Alacrity is entitled to litigation expenses related to the damages to the Property and the claim of lien. [35]  However, the Court finds that Alacrity is not entitled to litigation expenses related to the Security Deed.

Based on the foregoing, the Court has reviewed the fee statements provided by the parties and based on a review thereof and the Court's observations in the case, the Court has determined that the amount recoverable by Alacrity for attorney's fees should be $12,000.  The Court will give the parties until September 22, 2023, to object to this amount – to the extent that Alacrity thinks the amount should be higher or Popli thinks the amount should be lower based on the amount of time spent on the issues of the claim of lien and damage to property – as opposed to whether any amount should be awarded at all.  If either party objects to this amount, the Court will hold a hearing to allow the parties to present evidence and argument on the issue of why the amount should be higher or lower than $12,000, but if no objection is filed by September 22, 2023, the Court will promptly enter a final judgment consistent with this Order.

Accordingly, it is hereby

**ORDERED** that judgment shall be entered in favor of Alacrity and against

---

[35] Popli has now admitted that the claim of lien was not valid, which likely minimized the time and resources expended by Alacrity in seeking to have the claim of lien cancelled.

Popli on Counts I, II, and III for entry of an order cancelling the lien covering the Property and declaring it to be null and void, cancelling the Security Deed covering the Property and declaring it to be null, and void and enjoining Popli from taking any action to foreclose under the Security Deed; and it is

**FURTHER ORDERED** that judgment shall be entered in favor of Popli and against Alacrity on Count V for unpaid rent and additional rent accruing from September 2021 through July 2022; and it is

**FURTHER ORDERED** that judgment shall be entered in favor of Alacrity and against Popli on Counts VI and VII in the amount of $114,000 for the damage to or conversion of its property; and it is

**FURTHER ORDERED** that judgment shall be entered in favor of Popli and against Alacrity on Count VIII for indemnification; and it is

**FURTHER ORDERED** that judgment shall be entered in favor of Alacrity and against Popli on Count IX for punitive damages in the amount of $5,000; and it is

**FURTHER ORDERED** that judgment shall be entered in favor of Alacrity and against Popli on Counts IV and X for expenses of litigation in the amount of $12,000, to which amount Alacrity or Popli may file an objection on or before September 22, 2023, if either wishes to hold a hearing to present evidence and argument in favor of a higher or lower amount than $12,000, as opposed to whether

Alacrity is entitled to any fees at all.  If no objection is filed by that date, the Court will promptly enter a final judgment consistent with this Order.

The Clerk is directed to serve a copy of this Order on counsel for Alacrity and counsel for Popli.

**END OF ORDER**